**In re Kenneth and Andrea HARCHAR, Debtor(s).**

**Kenneth and Andrea Harchar, Plaintiff(s)**

v.

**United States of America, Defendant(s).**

**No. 07–3184.**

United States Bankruptcy Court, N.D. Ohio.

July 14, 2008.

Susan M. Gray, Susan M. Gray Attys & Counselors at Law, Rocky River, OH, Thomas C. Loepp, Stow, OH, for Plaintiffs.

Anita M. Gill, Cleveland, OH, Peter A. Sklarew, Tax Division, Dept. of Justice, Washington, DC, for Defendants.

## DECISION AND ORDER

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court on the Motion of the Defendant for Summary Judgment, and the Plaintiffs' Cross Motion for Summary Judgment. In support of their respective Motions, both Parties filed supporting evidentiary materials, as well as extensive Memoranda regarding their positions. The Court has now had time to review all these materials, and finds, for the reasons set forth herein, that the Defendant's Motion for Summary Judgment should be Granted, and that the Plaintiff's Motion for Summary Judgment should be Denied.

## BACKGROUND

On May 1, 1998, the Debtors/Plaintiffs, Kenneth and Andrea Harchar (hereinafter the "Debtors"), filed a petition for relief under Chapter 13 of the United States Bankruptcy Code. The Defendant, the United States of America (a.k.a., the "IRS"), was a creditor in the case by virtue of a prepetition tax arrearage owed by the Debtors. The following August, the plan of reorganization put forth by the Debtors was confirmed by the Court. In their plan of reorganization, the Debtors proposed to pay priority tax claims held by the Defendant in full; unsecured, nonpriority claims held by the Defendant, as well as other similarly situated creditors, were to be paid 5% over 43 months.

On June 12, 2000, the Debtors commenced the instant adversary against the Defendant alleging that the IRS caused them injury by wrongfully delaying to refund their tax overpayments for the years 1999 and 2000. A key component of the Debtors' Complaint stems from what is known as the V–Freeze. This is an administrative action, internally implemented by the IRS, whereby computer-automated transactions are suspended. In this particular case, the V–Freeze was implemented shortly after the Debtors filed their bankruptcy petition and had the effect of interrupting the automatic issuance of their tax refunds. Instead, any tax refund owed to the Debtors could only be issued if individually approved by an IRS representative.

As the legal basis for their Complaint, the Debtors allege that the Defendant's implementation of the V–Freeze, along with other conduct it undertook, resulted in the following: (1) a violation of the automatic stay of 11 U.S.C. § 362(a); (2) a violation of the Bankruptcy Code's anti-discrimination provision as set forth in 11 U.S.C. § 525; (3) a deprivation of their right of due process under the United States Constitution; and (4) a breach of the terms of their confirmed Chapter 13 plan. As redress, the Debtors' Complaint sought compensatory damages, including attorney fees, punitive damages, as well declaratory and injunctive relief.

At the present time, however, based upon prior court rulings and by agreement of the Parties, the issue now before the Court on the Parties' motions for summary

judgment has been limited in a couple of important respects. First, only the Defendant's alleged liability for a violation of the automatic stay is at issue. In particular, the matter before the Court is limited to whether the Defendant violated either paragraph (3) or (6) of § 362(a). Second, by agreement of the Parties, the Court's focus in this matter is limited to the events surrounding the Debtors' 1999 tax refund, with the adjudication of the Debtors' 2000 year tax refund being placed in abeyance pending the resolution of this matter.

Concerning these limitations, the events, as now outlined in the time-line below, were not contested:

On February 20, 2000, the Debtors filed their 1999 tax return.

On March 20, 2000, based upon internal administrative procedures, the Debtors' 1999 tax overpayment, totaling $4,303.00, was posted to the Debtors' account.

On April 20, 2000, the Debtors' account with the IRS was referred internally to its legal counsel for possible action.

On April 27, 2000, the IRS filed a Motion in the Debtors' bankruptcy case to modify their plan based upon the funds available from their 1999 tax refund.

On June 13, 2000, the Court held a hearing on the motion to modify, at which time the Debtors were directed to file amended bankruptcy schedules.

On July 7, 2000, the Debtors filed their amended bankruptcy schedules.

On July 11, 2000, the IRS withdrew its motion to modify the Debtors' Chapter 13 plan.

On July 18, 2000, the IRS issued a refund check to the Debtors. Included in the refund check was an interest payment of $101.69.

In addition, during this same period of time—particularly, beginning April 19, 2000—the evidence also reflects that the Debtor, Mrs. Harchar, made a number of calls to the IRS inquiring about the status of her tax refund. Although the evidence shows that her memory with respect to these calls was not always clear, it is accepted that Mrs. Harchar was never able to receive a definitive answer regarding the status of her refund. It is also accepted, for purposes of the matter now before the Court, that Mrs. Harchar was told by an IRS representative that she did not "deserve" her 1999 tax refund.

## PROCEDURE

The instant matter is before the Court on the Parties' Cross Motions for Summary Judgment. Federal Rule of Civil Procedure 56(c), which is made applicable to this proceeding by Bankruptcy Rule 7056, sets forth the standard for a summary judgment motion and provides, in part: A party will prevail on a motion for summary judgment when "[t]he pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). With respect to this standard, the movant must demonstrate all the elements of his cause of action. *R.E. Cruise Inc. v. Bruggeman,* 508 F.2d 415, 416 (6th Cir.1975). In making this determination, the Court is directed to view all the facts in a light most favorable to the party opposing the motion. *Matsushita v. Zenith Radio Corp.,* 475 U.S. 574, 586–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In addition, in cases such as this where the Parties have filed Cross Motions for Summary Judgment, the Court must consider each motion separately, since each party, as a

movant for summary judgment, bears the burden of establishing both the nonexistence of genuine issues of material fact, and that party's entitlement to judgment as a matter of law. *French v. Bank One, Lima N.A. (In re Rehab Project, Inc.)*, 238 B.R. 363, 369 (Bankr.N.D.Ohio 1999).

As the starting point for this discussion, an initial word on the overall course this proceeding has traveled is necessary. Since the Debtors filed their Complaint, more than eight years ago, a long and contentious history has followed. It suffices to say in this regard that this proceeding, originally assigned to Judge Morgenstern–Clarren, but recently transferred to this Court, has involved a contorted history through which both of the Parties have been able to form a knot which would have made Alexander shudder.[1] By way of example, in just terms of resources, this proceeding is alleged to have cost the Debtors approximately $100,000.00 in attorney fees, not to mention the substantial resources expended by the United States, for a case in which the Debtors' actual damages are admittedly limited—no more than $1,500.00 for each of the Debtors.

The extensive history of the case has also seen the filing of numerous and potentially dispositive motions, from which a number of decisions have resulted, including two decisions rendered from the appeal of the bankruptcy court's orders. *United States v. Harchar*, 331 B.R. 720 (N.D.Ohio 2005) (J. Wells); *United States v. Harchar*, 371 B.R. 254 (N.D.Ohio 2007) (J. Gaughan). As a result, certain aspects regarding the Debtors' Complaint for a stay violation have already been ad-

dressed. And to the extent applicable, these holdings will, in accordance with the law of the case doctrine, not be disturbed.

The "law of the case" doctrine holds that "a court should not reopen issues decided in earlier stages of the same litigation." *Agostini v. Felton*, 521 U.S. 203, 236, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997). The doctrine has been further defined to mean that "findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." *This That and the Other Gift and Tobacco, Inc. v. Cobb County, Georgia*, 439 F.3d 1275, 1283 (11th Cir.2006). The doctrine is grounded in the concept of consistency so that matters, once decided during the course of the same lawsuit, will continue thereafter, notwithstanding that different courts may come to hear the case. All the same, an actual decision of an issue is required to establish the law of the case. The law of the case doctrine, thus, will not reach to include any matter that was not actually decided. *Quern v. Jordan*, 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979) ("The doctrine of law of the case comes into play only with respect to issues previously determined.").

## DISCUSSION

By way of their respective Motions for Summary Judgment, the Parties have submitted to the Court one overall issue for resolution: whether the Defendant's conduct with regards to the Debtors' 1999 tax refund resulted in a violation of the Bank-

---

**1.** This refers to the Gordian Knot whose origin begins when Gordius, King of Phrygia, an ancient kingdom in what is now Turkey, allegedly tied his chariot to a hitching post before the temple of an oracle with an intricate knot. It was then prophesied that only the future ruler of all Asia could untie the knot. In 333 B.C., when wintering with his army, Alexander the Great came to the knot to untie it. When he could find no end to the knot, he simply sliced it in half with a stroke of his sword, going on thereafter to conquer Asia, and fulfill the prophecy. http://en.wikipedia.org/wiki/Gordian_Knot

ruptcy Code's automatic stay? Pursuant to 28 U.S.C. § 157, a determination regarding the applicability of the stay, including a violation thereof, is a core proceeding over which this Court has been conferred with the jurisdictional authority to enter final orders. 28 U.S.C. § 1334.

■■■ Upon the commencement of a bankruptcy case, an automatic stay arises as a matter of law; no formal notice or service of process is required for the stay to have effect. 11 U.S.C. § 362(a); *Smith v. First America Bank, N.A.*, 876 F.2d 524, 526 (6th Cir.1989). The scope of the stay is broad and will operate to enjoin essentially any act, whether the commencement or continuation thereof, by a creditor to collect on a prepetition claim. *In re Dorsey*, 373 B.R. 528 (Bankr. N.D.Ohio 2007). The stay is effective against "all entities," including the Defendant, the IRS. 11 U.S.C. § 362(a), § 101(15) (defining entity to include a "governmental unit."). A main function of the stay is to afford the debtor a breathing spell by stopping all collection efforts. *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 423 (6th Cir.2000). It also serves to protect creditors by ensuring that like creditors are treated equally according to the Bankruptcy Code's priority scheme. *Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d 374, 382 (6th Cir.2001) ("purpose of the automatic stay is to protect creditors in a manner consistent with the bankruptcy goal of equal treatment.").

The sum of the conduct enjoined by the automatic stay of § 362(a) is set forth in eight paragraphs. A violation by a creditor of any one paragraph will entitle a debtor to an award of compensatory damages, including attorney fees.[2] For purposes of this matter, at issue are paragraphs (3) and (6) of § 362(a). Respectively, these provisions provide:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title[.]

The Court's analysis concerning the applicability of these provisions will now proceed in order of enumeration.

### 11 U.S.C. § 362(a)(3)

■■■ In order to sustain an action for a violation of § 362(a)(3), three elements must be shown: (1) a property interest is involved; (2) the property interest is estate property; and (3) there occurred either an act to obtain possession of the estate property or there existed an act to exercise control over estate property. *In re Allentown Ambassadors*, 361 B.R. 422, 440 (Bankr.E.D.Pa.2007). Under the law of the case doctrine, the existence of the first two elements has already been established for purposes of this particular proceeding. Previously, in the second of the appeals to take place in this case, Judge Patricia A. Gaughan, for the United States District Court, Northern District of Ohio,

---

**2.** 11 U.S.C. § 362(h), in effect at the time the Debtors' case was filed, provided that "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attor- neys' fees, and, in appropriate circumstances, may recover punitive damages." With the enactment of BAPCPA, this provision, after slight modification, is now set forth in 11 U.S.C. § 362(k).

upheld the bankruptcy court's determination that the Debtors' 1999 tax refund constituted both an interest in property and property of the Debtors' bankruptcy estate for purposes of § 362(a)(3). *U.S. v. Harchar,* 371 B.R. 254, 261 (N.D.Ohio 2007).

As it concerns, however, the third and final requirement of § 362(a)(3), wrongful possession or control of estate property, Judge Gaughan declined to specifically rule. The reason: the procedural posture of the appeal, coming from a denial of the Defendant's Motion to Dismiss under FED. R.CIV.P. 12(b)(6), made any determination as to issues concerning "possession and control" under § 362(a)(3) premature. Specifically, Judge Gaughan, quoting from the bankruptcy court, stated that "any meaningful analysis of the case law on this issue (both as cited by the IRS and as cited by the debtors) will require consideration of the relevant facts, an exercise outside the scope of a 12(b)(6) motion." *Id.* at 263.

Unlike with the appeal in front of Judge Gaughan, however, which stemmed from the bankruptcy court's ruling on a 12(b)(6) motion to dismiss, the instant matter is before the Court on the Parties' Cross Motions for Summary Judgment. While both types of motions are dispositive motions, they are approached very differently insofar as it concerns the applicability of the evidence. 11 Moore's Federal Practice, ¶ 56.30[3][a].

In short, when presented with a 12(b)(6) motion, a court may only consider the allegations contained on the face of the complaint and must accept as true all of the averments of the complaint. *In re DeLorean Motor Co.,* 991 F.2d 1236, 1240 (6th Cir.1993). On the other hand, in a motion for summary judgment, the court is required to consider not only the pleadings, but any discovery and disclosure materials on file, along with any affidavits submitted in support. FED.R.CIV.P. 56(c). At this particular juncture, this difference makes the issue of "control and possession" under § 362(a)(3), (as well as a later determination under § 362(a)(6)), ripe for determination. In support of their respective positions, the Court has before it extensive evidentiary materials, including affidavits and depositions submitted from both of the Parties.

■ In her decision in *U.S. v. Harchar,* Judge Gaughan, while not specifically ruling on the issue of possession and control for purposes of § 362(a)(3), did provide some guidance, however, as to how the matter should be approached. Overall, Judge Gaughan rejected the Defendant's position that an administrative freeze can never amount to control or possession of property under § 362(a)(3). *U.S. v. Harchar,* 371 B.R. at 261–62. Rather, Judge Gaughan put forth an individualized approach whereby "courts must look to the particular allegations in each case to determine whether control has been exercised over the property. . . ." *Id.* at 260, fn. 10. In coming to her conclusion, Judge Gaughan limited the reach of a Supreme Court decision relied upon by the Defendant: *Citizens Bank of Maryland v. Strumpf,* 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995).

In *Strumpf,* the Court found that a bank's placing of an administrative freeze on the account of a chapter 13 debtor, pending resolution of the bank's right of setoff against the debtor, did not violate the automatic stay. *Id.* Comparing then its V–Freeze of the Debtors' tax refund to the administrative freeze in *Strumpf* the Defendant argued that a like result in this proceeding was required. Judge Gaughan, however, disagreed, stating:

> To the extent that Strumpf can be read as addressing control or possession, its

reach is much more limited. First, the Supreme Court stated that "petitioner's *temporary* refusal to pay was neither a taking of possession of respondent's property nor an exercising of control over it, but merely a refusal to perform its promise." (emphasis added). The "temporary" delay of Strumpf lasted only five days. Moreover, the Court allowed a temporary freeze only to protect the statutory setoff rights of the bank[.]

*Harchar*, 371 B.R. at 261–62 (internal citation omitted). Judge Gaughan, agreeing with the bankruptcy court, then summed up things by explaining that, "*Strumpf* provides little guidance on the control issue beyond its peculiar facts." *Id.* at 262.

Based on this, Judge Gaughan held that with respect to the particular issue of "control" under § 362(a)(3), the following allegations, as contained in the Debtors' Complaint, put forth a sufficient cause to withstand the Defendant's motion to dismiss:

the debtors filed a chapter 13 case; they proposed a chapter 13 plan which ultimately was confirmed; the refunds became due postpetition; the IRS did not tell the debtors it had frozen their refunds; the IRS did not have any procedures in place to explain to the debtors why their refunds had been frozen or how to challenge the freeze; the IRS did not respond to the debtors' repeated efforts to find out what had happened to their refunds; the IRS told Andrea Harchar that she did not deserve a refund; the IRS told Andrea Harchar that it would not release her refund because

the IRS was going to apply it to her prepetition debt; the IRS did not file a motion for relief from stay to apply the refund in that fashion; and the IRS delayed seven weeks before filing a motion to modify the debtors' plan, which the IRS later withdrew.

(Doc. 141, pg. 18). Within this framework, and based upon the arguments submitted by the Parties,[3] the question of whether the Defendant violated § 362(a)(3) may be fairly broken down into two overall issues: First, did the Defendant's implementation of the V–Freeze, thereby suspending the automatic issuance of the Debtors' 1999 tax refund, constitute an "act to exercise control" over the refund as proscribed by § 362(a)(3)? In other words, did the Defendant's implementation of the V–Freeze constitute a per se violation of the stay? Second, if the implementation of the V–Freeze did not, alone, constitute an "act to exercise control" over the Debtors' refund, does the Defendant's conduct, *in toto*, rise to that level?

### Does the V–Freeze Constitute a Per Se Violation of 11 U.S.C. § 362(a)(3)?

 When first enacted, § 362(a)(3) proscribed "any act to obtain possession of property of the estate or of property from the estate." In a 1984 amendment to the Bankruptcy Code,[4] however, § 362(a)(3) was expanded to also proscribe any act "to *exercise control* over property of the estate." (emphasis added). No explanation was given for the amendment, but the Sixth Circuit Court of Appeals explained that it could "have been intended to make clear that (a)(3) applied to property of the

---

**3.** By way of example, the Debtors stated in their arguments to the Court that the "freeze is only the first of the IRS actions that violated the automatic stay. The second was the specific affirmative decision to maintain possession and control of property of the estate

in the face of an affirmative demand to release it." (Doc. No. 194, at pg. 4).

**4.** The Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 355.

estate that was not in the possession of the debtor." *Javens v. City of Hazel Park (In re Javens),* 107 F.3d 359, 368 (6th Cir. 1997). Contextually, this makes sense.

The intended function of § 362(a)(3) is to implement the bankruptcy goal of preventing the dismemberment of the estate and to insure its orderly distribution. *SEC v. First Financial Group of Texas,* 645 F.2d 429, 439 (5th Cir.1981), *citing* S.R. No. 95–989, 95th Cong., 2d Sess. 50, H.R. No. 95–595, 95th Cong., 2d Sess. 341, reprinted in (1978) U.S.Code Cong. & Ad. News 5787, 5836 and 6298. In many instances, however, when a petition in bankruptcy is filed, property belonging to the estate will not be in the possession of the debtor. Commonly this situation arises because a creditor has exercised its pre-petition right to levy on the property. In such a situation, the levying creditor's continued possession and even use of estate property would not have, under a strict reading, run afoul with § 362(a)(3) as first written. This is because with the creditor already having possession of the property at the time the bankruptcy case was commenced, there could not truly exist "any act to *obtain* possession of property of the estate or of property from the estate." (emphasis added). Obtain, defined as "to gain possession of," necessarily requires an affirmative act, and thus would not apply where a creditor passively retained possession of estate property. WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 499 (1984).

▪ Under the original version of § 362(a)(3), therefore, a finding of liability on the part of the Defendant, who was already in possession of the Debtors' tax refund at the time their petition was filed, would have gone contrary to a strict interpretation of the provision. However, with the amendment to § 362(a)(3), this is no longer the case. By now proscribing any

"act to exercise control" over estate property, the net of § 362(a)(3) has been cast wider, with it being well accepted, as the Court in *In re Javens* anticipated, that creditors, having possession of a debtor's property at the time a bankruptcy case is commenced, may by their actions violate the stay. *See, e.g., Borman v. Raymark Industries Inc.,* 946 F.2d 1031, 1034 (3rd Cir.1991) ("Subsection (a)(3) applies regardless of whether the property is in the debtor's possession, . . . .").

▪ At the same time, possession, alone, will not equate with an "act to exercise control over property of the estate" as proscribed by § 362(a)(3). Control, necessarily requires a creditor to exercise some authority or influence over the property in derogation of the estate. The degree of control necessary to rise to the level of a stay violation, however, is not defined and has lead to a divergence of opinion on the issue.

At one end of the spectrum, some courts have found that once a creditor learns of a debtor's bankruptcy, § 542(a), governing turnover of estate property, imposes on the creditor an affirmative duty to return the collateral to the debtor, and that a failure to do so constitutes an act to exercise control over estate property in violation of § 362(a). *See, e.g., Knaus v. Concordia Lumber Co. (In re Knaus),* 889 F.2d 773, 775 (8th Cir.1989) ("[T]he duty [to turn over property of the estate] arises upon the filing of the bankruptcy petition. The failure to fulfill this duty, regardless of whether the original seizure was lawful, constitutes a prohibited attempt to 'exercise control over the property of the estate' in violation of the automatic stay."). Other courts, however, have declined to extend the concept of "control" this far, finding that "the passive act of maintaining the status quo through the continued retention of property seized prepetition" will

not, itself, give rise to a stay violation. *See In re Bernstein*, 252 B.R. 846, 849 (Bankr. D.D.C.2000). *See also In re Young*, 193 B.R. 620, 625 (Bankr.D.Dist.Col.1996) (to exercise control connotes "positive acts of bringing into play, making effective in action, bringing to bear, exerting.").[5] As observed in *In re U.S. Physicians, Inc.*:

> had Congress intended the amendment to § 362(a)(3) to require immediate turnover, more passive language such as 'retain control' would be found in the revision to Section 362(a)(3) of the Code. By the same logic, if Congress intended to prohibit creditors from holding property seized pre-petition, it also could have barred an act to "retain possession." Read in this context, the prohibition against an act to exercise control does not reach the passive act of continuing to possess property.

235 B.R. 367, 375 (Bankr.E.D.Pa.1999).

The position advocated by the Debtors corresponds closely to the first approach, requiring immediate turnover once a creditor has knowledge of the debtor's bankruptcy. According to the Debtors, the Defendant violated the automatic stay because:

> it took the Harchar refund processing out of the normal stream of refund processing for the post petition tax year. For all other taxpayers against whom the IRS had no prior year tax claim, the IRS processed tax refunds through an automated system. Instead of treating the Harchar tax refund like the refunds for all other tax payers against whom it had no right to collect on a prior year claim, and solely because it had a prior year tax claim, it blocked the operation

of the automated system and blocked the automated issuance of the refund. (Doc. 197, at pgs. 2–3). Support for the Debtors' position, that turnover of estate property is immediately required upon reasonable demand, can be found in the decision rendered by the Bankruptcy Appellate Panel for the Sixth Circuit in *TranSouth Fin. Corp. v. Sharon (In re Sharon)*, 234 B.R. 676, 682 (6th Cir.BAP1999).

In *In re Sharon*, the Court found that a creditor, who had legally repossessed a debtor's car prepetition, is under an affirmative duty to return the car once a proper demand for the property's return is made. *Id.* A creditor who fails to comply with this duty, according to the Court, willfully violates the automatic stay of § 362(a)(3), and thus is liable for statutory damages. *Id.* at 687–88. A necessary component of this decision was the Court's application of the turnover provision of § 542(a), and the Court's conclusion that the provision was self-executing which, in turn, prohibited a creditor from conditioning the return of the vehicle on the debtor providing what it considered to be adequate protection. A creditor who felt that it was not adequately protected had to, instead, first return the property, and then file a motion before the bankruptcy court to receive adequate protection. *Id.* at 683–84.

Other decisions, involving an affirmative duty to turnover over estate property, generally have these same attributes: the property at issue was tangible collateral (in many instances a vehicle); ownership by the debtor of the property was not in dispute; and the creditor's affirmative duty to turnover the property was trig-

---

**5.** Other cases include: *In re Quality Health Care*, 215 B.R. 543, 572, 578 (Bankr.N.D.Ind. 1997); *In re Bernstein*, 252 B.R. 846, 849 (Bankr.D.D.C.2000) (§ 362(a)(3) does not require turnover); and *In re Young*, 193 B.R. 620, 624–25 (Bankr.D.D.C.1996) (same); *In re Mountaineer Coal Co., Inc.*, 247 B.R. 633, 642 (Bankr.W.D.Va.2000) (failure to refund insurance premium).

gered by § 542(a). *Knaus v. Concordia Lumber Co. (In re Knaus)*, 889 F.2d 773, 775 (8th Cir.1989) (creditor's failure to voluntarily turn over merchandise lawfully seized prepetition constituted a violation of the automatic stay.); *STMIMA Corp. v. Carrigg (In re Carrigg)*, 216 B.R. 303, 305 (1st Cir. BAP 1998) (creditor violated stay where, once learning of bankruptcy, it attempted to transfer title of securitized vehicle); *Abrams v. Southwest Leasing & Rental Inc. (In re Abrams)*, 127 B.R. 239, 241–43 (9th Cir.BAP1991) (failure to return repossessed car after receiving notice of Chapter 7 filing constituted a violation of the automatic stay); *In re Jackson*, 251 B.R. 597, 601 (Bankr.D.Utah 2000) (upon being advised of debtor's bankruptcy, creditor's refusal to return to Chapter 13 debtor a motor vehicle that it had seized prepetition was an attempt to "exercise of control over property of the estate," in violation of automatic stay).

Such attributes, however, are not altogether present in the situation presented in this matter, where a taxing authority is processing a debtor's tax refund. These differences, as now explained, make it difficult to construe the Defendant's implementation of the V–Freeze in the Debtors' case as a per se violation of the § 362(a)(3).

First, those courts, such as in *In re Sharon*, which found a stay violation when a creditor refused a reasonable demand from the debtor to have the property returned, did so on the basis that a creditor's obligation for turnover under § 542(a) commenced with the case. In other words, there existed a direct linkage between whether a creditor complied with its duty of turnover, and whether the creditor

violated the stay of § 362(a)(3). As succinctly stated in *In re Sharon:*

> 11 U.S.C. § 542(a) provides that an entity in possession of estate property shall deliver such property to the trustee. This is a mandatory duty arising upon the filing of the bankruptcy petition. Thus, without doubt, a creditor's knowing retention of property of the estate constitutes a violation of § 362(a)(3).

*In re Sharon*, 234 B.R. at 685. This provision, however, is not strictly applicable when tax refunds are held by the IRS.

Where the IRS owes a refund to a debtor, a debt for purposes of bankruptcy law exists. 11 U.S.C. § 101(12). And where a debt (as opposed to a tangible item of property) is owed to a debtor that is property of the estate—characteristics which in this case have already been established by Judge Gaughan— § 542(b), not § 542(a), applies [6] by providing:

> (b) Except as provided in subsection (c) or (d) of this section, an entity that *owes a debt* that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

(emphasis added). The applicability of this provision, however, as opposed to § 542(a), is particularly ill-suited when seeking to link a creditor's failure to turnover over estate property with a per se violation of the stay.

Section § 542(b), unlike § 542(a), has a temporal limitation: it only becomes effective when the debt is matured or other-

---

**6.** *See In re Calvin*, 329 B.R. 589, 601 (Bankr. S.D.Tex.2005) (when a debt is at issue, § 542(b), being a more specific statute, applies over § 542(a)). *See also In re Bourne*, 262 B.R. 745, 756 (Bankr.E.D.Tenn.2001) (turnover request for tax refund covered by § 542(b), not § 542(a)).

wise payable on demand or order. Until this event occurs, there can exist no duty of turnover, and thus, under the reasoning of *In re Sharon,* as well as other like cases, no violation of the stay can exist for purposes of § 362(a)(3). Ergo, to the extent that a creditor's duty of turnover is intertwined with a stay violation under § 362(a)(3), no per se violation of the stay can exist under § 542(b) because, dissimilar to § 542(a) which becomes immediately applicable upon the commencement of the bankruptcy case, the applicability of § 542(b) is driven by nonbankruptcy events. Demonstrative of this supposition are the particular circumstances of this case.

As with other interests in property, the determination of when a debt is matured or otherwise payable on demand or order is made in accordance with applicable nonbankruptcy law, here the United States Tax Code. *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979) (whether a party has an interest in property and the extent of that interest is determined by applicable nonbankruptcy law). Under the Tax Code, a taxpayer is not entitled to interest on a tax overpayment until 45 days after the due of the return, presumably arising in this case on May 30, 2000, assuming that the Debtors' 1999 tax return was due on April 15. 26 U.S.C. § 6611(e)(1). Additionally, the Tax Code prescribes that, unless a claim for a refund has already been denied, a suit for a refund may not be brought until the expiration of six months after the claim for the refund has been filed, occurring in this case on August 20, 2000, considering that the Debtors filed their 1999 tax return on February 20, 2000. 26 U.S.C. § 6532(a)(1). A taxpayer has no recourse with regards to a refund held by the IRS before the expiration of these dates.

It may, therefore, be stated that the debt represented by the Debtors' 1999 tax return did not mature, for purposes of § 542(b), until May 30, 2000, at earliest, and possibly not until August of 2000. Regardless, both these events occurred well subsequent to the time the V–Freeze was entered against the Debtors' account, with the V–Freeze being implemented against the Debtors shortly after they filed their petition in 1998. Resultantly, with such a large time difference, the IRS's duty to turnover the Debtors' 1999 tax refund pursuant to § 542(b) cannot be linked with a per se stay violation.

Even putting aside the issue of turnover, and its legal impediment to the recognition of a per se rule that the implementation of the V–Freeze gives rise to a stay violation under § 362(a)(3), practicable considerations also support looking to the merits of each case based upon its particular facts. The first of these practicable considerations is the most obvious. If the V–Freeze were not implemented, debtors owing back taxes would be automatically issued collection notices, thereby giving rise to a stay violation. As the Defendant pointed out in this matter:

> the "so-called 'freeze' is not specifically a freeze of refunds. The 'freeze' code, which is input on liability accounts when the IRS receives notice of a bankruptcy, stops all automated activity. This is done mainly to prevent stay violations because, ordinarily, the IRS computer carries on automated collection activity, including automatically causing the printing and issuance of demand notices that are then mailed by clerical personnel."

(Doc. No. 180, at pg. 8). The IRS is, thus, given a Hobson's choice: implement the V–Freeze and be found on that basis, alone, to have violated the stay; or, do not implement the V–Freeze and hope that its

automated system will not commit a violation of the stay such as by sending collection notices to a debtor or by taking an offset on a prepetition tax liability.

This concern also extends beyond just the IRS. Whether good or bad, it is the reality today that many entities have automated billing/collection systems. Such systems, while possibly efficient, cannot always take into account the intricacies necessitated by bankruptcy law, particularly the automatic stay. In this way, this Court recently admonished a creditor for not disabling their automated billing system. In *In re Harris*, this Court rejected a creditor's position that its mistake, failing to remove a debtor's name from its automated billing system, should insulate it from liability for a stay violation. 374 B.R. 611, 616–17 (Bankr.N.D.Ohio 2007). Instead, this Court held that, so long as the creditor had notice of the stay, a willful violation existed, notwithstanding the mistake. *Id.*

Having said this, the IRS has acknowledged that it can fine tune its V–Freeze so that "when an overpayment posts, the computer, instead of maintaining the status quo until an IRS employee implements transactions manually, will cause the refunding of the full overpayment without transferring any part of it to satisfy the unpaid liability." (Doc. No. 180, at pg. 8). However, the Court believes that, insofar as it concerns a per se violation of the stay, this is unnecessary. When a debtor files for bankruptcy relief, creditors should be encouraged, not discouraged, to disable automated collection systems. Requiring that a computer system be fine-tuned to recognize all the contingencies that bankruptcy law may bring is simply unrealistic and unnecessary. Having said this, the Court finds credible the statement made by the IRS that it implements the V–Freeze "partly out of concern for the ina-

bility to program machinery to account for all the nuances of bankruptcy law in a dynamic legal environment." *Id.* Further practicable considerations also make it injudicious to institute a per se rule that the Defendant's implementation of the V–Freeze constitutes a stay violation.

The estate, together with its preservation, lie at the heart of bankruptcy law. *See* 11 U.S.C. § 503(b)(1)(A) (allowing administrative expense of cost and expenses incurred in preserving the estate); 11 U.S.C. § 363(c)(2) (court permission required to use cash collateral). Thus, in a situation where, as Judge Gaughan has already affirmatively ruled in this matter, a tax refund is property of the estate, extra precaution should be exercised before turning the asset over to the debtor. Otherwise, entities having potential claims to the proceeds of the tax refund, whether the taxing authority or another creditor, stand a significant risk of suffering a loss of the asset if it is immediately turned over to the debtor. A tax refund, unlike vehicles and other similar personalty, is in the nature of cash, making it highly susceptible to rapid dissipation.

Under these conditions, it seems appropriate that the general policy of the automatic stay, that of providing the debtor a breathing spell, must temporarily give way to the specific policy of § 362(a)(3), that of securing and preserving the debtor's property and of ensuring equal distribution of the debtor's assets to similarly situated creditors. Creditors, therefore, in possession of an estate asset consisting of cash or a similar equivalent should not be faulted for exercising caution in their handling of the asset. To this end, the Defendant offered a number of legitimate reasons why its act of implementing the V–Freeze is consistent with the goal of preserving estate assets. Specifically, as set forth in its Motion for Summary Judgment, and then

supported by Rule 56 evidence, the Defendant provided these plausible explanations concerning its implementation of a V–Freeze against a debtor's tax refund: (1) it affords time to decide whether to file a motion to modify a debtor's plan based upon the premise that a substantial tax refund may constitute additional disposable income available to the debtors, (Doc. No. 180, Pt. 2, Yellon Decl. ¶ 5(4)); (2) the freeze allows it to check whether the debtor has defaulted on a plan, *Id.*; (3) the freeze allows it to preserve its prepetition right of setoff, *Id.*, at ¶ 5; and (4) if it is determined a tax refund is estate property, the implementation of the freeze allows the tax refund to be sent to the trustee if required. *Id.* Ex. 5, at pg. 305.

To be sure, the Defendant let it be known that, concerning its third point, it has no right of setoff with respect to the Debtors' 1999 tax refund. On the other hand, the Defendant's final point, concerning who should receive a tax refund—the trustee or the debtor—raises a pertinent issue which even further militates against concluding that a V–Freeze should give rise to an automatic violation of § 362(a)(3).

Section 542(b) delineates that even upon maturity, a debt that is property of the estate is to be paid to the trustee, not the debtor. In this regard, the Supreme Court has held that where a statute specifies the trustee as the party to whom a right is conferred, it should not be extended so as to apply to other parties. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (interpreting § 506(c)). Moreover, unlike in a Chapter 11 bankruptcy, which confers upon the debtor-in-possession the status of a trustee, able to exercise a trustee's power of turnover, this right is not specifically accorded to a Chapter 13 debtor. *Compare* 11 U.S.C. § 1107 (affording debtor-in-possession full powers of trustee), and 11 U.S.C. § 1303 (conferring upon debtor some limited powers held by trustee). *See also In re Bernstein*, 252 B.R. 846, 852 (Bankr.D.C.2000) ("Section 542(b) is simply an acknowledgment that the trustee, not the debtor, is entitled to receive payment of monetary obligations owed to the debtor ...").

The Debtors' reading of the V–Freeze and § 362(a)(3), thus, again places before the IRS a potentially Hobson's choice. Pay an estate tax refund to the debtor and place itself in jeopardy if it is later determined that it misappropriated estate property by not paying the refund to the trustee. Or, pay the refund to the trustee, and risk being found in violation of the automatic stay. It is, therefore, hard to fault a creditor, such as the Defendant, who has put in place a system which prevents the automatic issuance of estate funds to the debtor pending resolution by a bankruptcy court.

Adopting a per se rule that the Defendant's V–Freeze violates the automatic stay of § 362(a)(3) also goes contrary to Supreme Court's decision in *Citizens Bank of Maryland v. Strumpf*, in which it was held that a five-day administrative freeze on a debtor's bank account did not violate the stay of § 362(a)(3). 516 U.S. 16, 21, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995). To be sure, Judge Gaughan held that this decision provided "little guidance on the control issue beyond its peculiar facts." *U.S. v. Harchar*, 371 B.R. 254, 262 (N.D.Ohio 2007). At the same time, the underlying point of *Strumpf cannot* be ignored: the implementation of an administrative freeze does not automatically result in a stay violation under § 362(a)(3).

In fact, Judge Gaughan's decision indirectly recognized this point. As the Defendant pointed out, if Judge Gaughan had

determined that the V–Freeze resulted in a per se violation of § 362(a)(3), there would have been no reason to remand the appeal of its 12(b)(6) motion to dismiss so as "to consider the facts of this case, given that it was never disputed that the IRS turned off computer automated refunding (as it routinely was doing in most of the country) and that it also was not disputed that it determined to withhold a manual refund pending the filing and adjudication of a motion to modify the plan." (Doc. No. 181, at pg. 2).

In sum, the Court, for all these reasons, is not persuaded that the Defendant's internal procedure of implementing a V–Freeze against a debtor's tax refund will, as a matter of law, equate with a stay violation for purposes of 11 U.S.C. § 362(a)(3).

The next question before the Court, thus, becomes whether the sum of the Defendant's actions can be construed to constitute an "act to exercise control" over the Debtors' refund as proscribed by 11 U.S.C. § 362(a)(3).

### Does the Defendant's conduct, *in toto,* give rise to a stay violation under 11 U.S.C. § 362(a)(3)?

■ Even in the absence of a per se violation of the stay, Judge Gaughan held, in her decision in *U.S. v. Harchar,* 371 B.R. 254 (N.D.Ohio 2007), that the allegations contained in the Debtors' Complaint, which include but also go beyond the V–Freeze, were sufficient to withstand a Rule 12(b)(6) Motion to Dismiss. These allegations, as summed up by the Debtors, are: (1) the Defendant's admission that it was "taking" her refund; (2) Mrs. Harchar's deposition testimony that the Defendant told her she did not "deserve" her refund; (3) the Defendant's failure to inform either of the Debtors or the Court that it had frozen the refund; and (4) the extreme delay the Defendant took in returning the Debtors' 1999 tax refund. (Doc. No. 182, pgs. 5–6). Throughout their arguments to the Court, the Debtors vehemently contend that, based upon Judge Gaughan's holding, the law of the case doctrine compels a finding in their favor once an affirmative showing has been made that these allegations are true.

This Court, however, disagrees that, insofar as it concerns the issue of "control" under § 362(a)(3), Judge Gaughan's decision extends that far. As explained earlier, an actual decision of an issue is required to bring into applicability the law of the case doctrine. And as was previously noted, Judge Gaughan simply held that, concerning the issue of "control," "any meaningful analysis of the case law on this issue (both as cited by the IRS and as cited by the debtors) will require consideration of the relevant facts, an exercise outside the scope of a 12(b)(6) motion." *Id.* at 263.

Based, therefore, on this holding, the Court does not take from Judge Gaughan's decision that a finding in the Debtors' favor is compelled simply because the Debtors are able to show, at some level, the existence of the above factual allegations. Rather, the Court takes from Judge Gaughan's decision that the particular circumstances surrounding the Debtors' allegations against the Defendant must be considered. Per Judge Gaughan's statement, the Court begins this exercise by first looking to past decisions which have addressed the interplay between tax refunds and the automatic stay.

According to the Debtors, when the practice by the IRS of implementing a V–Freeze has been litigated, "the courts have held that the practice does violate the automatic stay and held the Defendant in contempt." (Doc. No. 182, at pg. 8). As support for this, the Debtors called particular attention to three cases: *In re Mea-*

*ley,* 16 B.R. 800 (Bankr.E.D.Pa.1982); *In re Burrow,* 36 B.R. 960 (Bankr.D.Utah 1984); *United States v. Holden,* 258 B.R. 323 (D.Vt.2000). All these cases, as the Debtors correctly point out, have a common denominator: a stay violation has been found to exist when the IRS retained possession of a debtor's tax refund.

Given slightly different factual circumstances, however, not all cases have come to this same conclusion. For example, in *In re Tillery,* 179 B.R. 576, 580–81 (Bankr. W.D.Ark.1995), the court found that the mere retention by the IRS of a debtor's income tax refund in order to preserve its right of setoff did not violate the automatic stay. In addition, in *In re Price,* 134 B.R. 313, 319–20 (Bankr.N.D.Ill.1991), it was held that the existence of a delay by the IRS in processing a tax refund for a chapter 13 debtor will not necessarily give rise to a stay violation.

Moreover, whatever similarities that exist between this case with those decisions cited by the Debtors, *supra,* there also exist noticeable differences. First, in *In re Mealey,* the court's decision, while finding that the retention by the IRS of the debtors' tax refund resulted in a stay violation, was limited in this respect: it only addressed the stay's prohibition against the act of setoff under § 362(7), which occurred when the IRS setoff the debtors' tax refund against a prepetition tax liability. Also of importance for purposes of this case, the court in *In re Mealey* did not find that the implementation of a freeze code automatically resulted in a violation of the stay, but held that with respect to a setoff, an "artificial measure, such as a bookkeeping entry, cannot be determinative." *Id.* at 802.

In *In re Burrow,* 36 B.R. 960 (Bankr. D.Utah 1984), the Court only found that the V–Freeze resulted in a stay violation when it "delayed the payment of debtors'

tax refundy *far beyond* the time when it normally would have been paid." (emphasis added). The court in *In re Burrow* also noted that the V–Freeze "had some beneficial effects such as preventing the collection of taxes through automatic offset of tax refunds and overpayments ..." *Id.* at 963. Similarly, in *United States v. Holden,* 258 B.R. 323 (D.Vt.2000), the court, while finding that the V–Freeze violated the automatic stay, observed that under the facts presented, the IRS "had no apparent intention of promptly approaching the Bankruptcy Court for entry of an appropriate court order." *Id.* at 328 (internal citation omitted).

As this comparative analysis shows, no bright-line rule manifests itself regarding when the IRS, by holding a debtor's tax refund, will become liable for a stay violation. Instead, what can be garnered from these cases is that, when determining the existence of "control" under § 362(a)(3), it is all a matter of degrees. The greater the impact the actions of the IRS will have on the bankruptcy estate, the greater likelihood that such actions will be found to have constituted an impermissible "control" of estate property as proscribed by § 362(a)(3). This flexible approach is consistent with the general body of case law which has addressed the issue of 'control' under § 362(a)(3). *In re Allentown Ambassadors,* 361 B.R. 422, 440 (Bankr.E.D.Pa.2007). *See also In re Connecticut Pizza, Inc.,* 193 B.R. 217 (Bankr. D.Md.1996) (consistent with its explicit purpose, actions that tend to maintain status quo are less likely to be considered violation of § 362(a)(3), while affirmative acts to obtain possession of or control over estate property are more likely to be deemed violations of § 362(a)(3)). For example, in *In re National Cattle Congress, Inc.,* it was observed that when addressing § 362(a)(3), a "continuum of conduct exists

which the Court must evaluate in determining whether [a party] has assumed control of property of the estate." 179 B.R. 588, 597 (Bankr.N.D.Iowa 1995), *remanded on other grounds,* 91 F.3d 1113 (8th Cir. 1996).

When examining the actions of the IRS in connection with a debtor's tax refund, the following examples provide what, in this Court's view, are proper illustrations of what may be said to constitute the outside parameters of this inquiry. At one extreme, if the IRS were to explicitly condition the turnover of a tax refund on the debtor paying a prepetition tax liability, "control" for purposes of § 362(a)(3) would be absolute, thereby resulting in a sanctionable stay violation. At the other end of the spectrum, however, no actual "control" could be said to exist if the IRS, during its normal course of operations, was simply going about the events to process the debtor's tax refund. As it regards the latter statement, the Court finds it inconceivable that, in enacting § 362(a)(3), Congress could have meant to afford a debtor the right, at the expense of other similarly situated taxpayers, to be placed in a priority position for the issuance of a tax refund.

■ On the issue of "control" under § 362(a)(3), Judge Gaughan, having determined in her decision that the Debtors' Complaint set forth sufficient allegations to withstand a 12(b)(6) Motion to Dismiss, did not explore the contours of the issue in great detail. However, when placed within the parameters just discussed, the basis for her decision takes on a particular clarity. The allegations made by the Debtors make it plausible that strong coercive pressure was being brought to bear on the Debtors to pay their nonpriority tax liability. Coercive pressure is, of course, the antitheses of the policy goals behind the automatic stay, and thus its existence will weigh heavily toward a finding that a stay

violation exists. Not only does such pressure potentially frustrate the policy goal of the automatic stay oriented toward the debtor—that of affording a breathing spell—but it could also frustrate the other policy goal of the stay—to afford creditors equal treatment—if the debtor affords the creditor applying coercive pressure favorable treatment.

Notwithstanding, when one begins to pull the layers back on the evidence presented in this case, what is revealed is not an exercise on the part of the IRS to control the Debtors' refund, but rather only the reasonable procedures implemented by the IRS when handling the Debtors' 1999 tax refund within the confines of the bankruptcy process. Of particular significance in this regard is that, contrary to what the Debtors allege, the delay they incurred in receiving their 1999 tax refund cannot be termed excessive.

At its widest reach, the sum of the time it took the Debtors to receive their 1999 tax refund comprised almost six months, involving these two dates: February 20, 2000, when the Debtors filed their return; and July 18, 2000, when the Debtors were issued their 1999 tax refund. Arguably, this period could be termed excessive. Yet, upon closer examination, the time period which can be ascribed to an actual delay is much shorter.

First, it is not practicable to expect that the IRS will issue a refund as soon as a tax return is filed. Processing is necessary. Thus, the earliest the Debtors could have expected to receive their 1999 tax refund occurred in the time period immediately following March 20, 2000, when, based upon internal administrative procedures, the IRS posted the Debtors' 1999 tax refund to their account. Likewise, at the other end of the time line, the Court will not look to the date the refund was actually issued, on July 18, 2008, but will instead

utilize April 27, 2000, the date on which the Defendant filed its Motion to modify the Debtors' Chapter 13 plan. To hold otherwise, as now explained, ignores the role of the court in the bankruptcy process.

 The automatic stay does not protect a debtor from all creditor action. Just the opposite, the function served by the stay is to enable parties to come before the bankruptcy court and adjudicate their rights within the confines of the Bankruptcy Code. As explained in the case of *Ameritrust Co. v. Opti–Gage, Inc. (In re Opti–Gage, Inc.)*:

> The injunction of § 362, then, serves as a mechanism for this court to control creditor action and encourages creditors to come to this court to resolve their claims. While the automatic stay is intended to temporarily protect a debtor from lawsuits and collection efforts by creditors outside the bankruptcy court, the court finds no legislative intent to prohibit creditors from bringing actions in the bankruptcy court where the debtor has filed his petition:

> Although § 362(a) generally bars all debt collection efforts against the debtor or the property of his bankruptcy estate after the filing of the petition, the stay implicitly does not bar a party from commencing an adversary or contested proceeding against the debtor under the caption of the bankruptcy case in the court where the petition is pending.

130 B.R. 257, 258–59 (Bankr.S.D.Ohio 1991) (internal citations omitted). *See also In re Rivera*, 345 B.R. 229, 235 (Bankr. E.D.Cal.2005) (placing of an administrative freeze on prepetition tax refund owing to Chapter 13 debtor, pending motion by the Internal Revenue Service (IRS) for relief from stay to exercise right of setoff, was not itself a violation of automatic stay).

Considering this policy of *pendente lite*, the Court is loath to find that a party, who has come to the Court in good faith regarding the disposition of an estate asset, should be punished during the pendency of its motion if it is later determined that they did not have a right to possession of the asset. A reciprocal point also cannot be ignored. A debtor who feels that irreparable harm will result if they are not given immediate possession of an estate asset can always come before the court and seek an immediate order from the court for turnover. The record in this case, however, does not reflect that the Debtors filed such an action.

Consequently, the delay the IRS took in issuing the Debtors refund can only be counted as slightly more than one month. This, while not an insignificant period of time, does not seem excessive under the circumstances. The record in this case is devoid of any indication that, in processing the Debtors' 1999 tax return, the IRS acted in bad faith by singling the Debtors out for disparate treatment over other similarly situated debtors. Instead, as now shown, the character of the month delay is more akin to a lag in processing time, thereby negating any notion of control.

First, as already observed, the IRS was under no legal duty to provide the Debtors their tax return until at least May 30, 2000. But even this aside, it is accepted that the months of March and April are busy for the IRS. Common sense, therefore, supports the explanation offered by the Defendant which holds that the "time that elapsed was simply due to the number of cases the IRS has to monitor and related tasks it must perform, with varying deadlines and varying levels of importance or urgency, and requiring varying amounts of time to complete." (Doc. No. 180, at pg. 16). In fact, Ms. Grey, the attorney for the Debtors, appears to have acknowledged so much, as exhibited by the following deposition transcript taken by her of

Robert Butts, who is an IRS advisor, in which it was set forth:

Question (Ms. Grey, attorney for Debtors)

And you drafted a referral to counsel; is that correct?

Answer (Robert Butts)

Yes.

Question (Ms. Grey, attorney for Debtors)

Is there any reason for the time between 3/15 and 4/21?

Answer (Robert Butts)

Just normal business processing, other case loads, other—

Question (Ms. Grey, attorney for Debtors)

I understand. You have a lot to do so I'm not criticizing you. I'm just asking if that's the reason. You have a big case load. Okay.

(Butts Dep., at pg. 15).

Additionally, tax refunds for Chapter 13 debtors are considered income. *Freeman v. Schulman (In re Freeman)*, 86 F.3d 478, 481–82 (6th Cir.1996) (tax refund, even though exempt under state law, qualifies as disposable income). And in a Chapter 13 bankruptcy, a debtor is required to devote all of their "disposable income" to their plan of reorganization. 11 U.S.C. § 1325(b). Thus, it does not seem out of the ordinary that the IRS would want to seek to modify the Debtors' plan because, as it pointed out, the "plan provided for only a 5% dividend on the IRS's unsecured claim of $6,335 and the $4,303 overpayment, if treated as disposable income and turned over to the trustee, was large enough to increase that percentage substantially...." (Doc. No. 180, at pg. 10).

The records maintained by the IRS, and provided as evidence in support of its Motion for Summary Judgment, further support the notion that the IRS, in processing the Debtors' 1999 tax refund, was not seeking to coerce the Debtors through extrajudicial means. Of particular importance, for the dates mentioned above in the deposition testimony taken of Mr. Butts— March 15 and April 21—the following notational entries were posted by the IRS to the Debtors' tax account:

3/15/2000 updated by drpic31

received a credit transcript for [Debtors' account] in the amount of $4303.00 .... unsecured general only getting 5–percent ... most of the proof of claim is unsecured general .... gave case to advisor to request offset

4/21/2000 updated by rabutt31

DRAFTED REFERRAL to have the debtors' plan modified based on the fact that they are due to receive a large refund for [their account] and the bulk of their pre-pet. debt is general unsecured.....

(Doc. No. 180, Ex. Pt. 4). Such entries clearly show that, as opposed to seeking to place the Debtors' 1999 tax return beyond their reach, the IRS was simply going about the process of determining its options, vis-a-vis the Debtors' 1999 tax refund, within the confines of bankruptcy law. It is also noted that there exist additional entries of a similar character and, while not repeated here for brevity's sake, further foster this same conclusion. *Id.*

This is not to say that a creditor, the IRS included, may indefinitely sit on its right to seek judicial redress without running afoul with § 362(a)(3). At some point, a party's dilatory conduct will cross the line so as to constitute an act to "exercise control" over estate property. However, while it may have been drawing close, the Court is not convinced, for those reasons just explained, that the IRS crossed this line. These same points,

along with some additional considerations which will become clear, also generally carry forward to those statements which the Debtors cite as establishing that the IRS sought to "control" their 1999 refund.

These statements, as set forth *supra,* involve (1) the Defendant admitting that it told Mrs. Harchar that it was "taking" her tax refund, and (2) Ms. Harchar's deposition testimony that the Defendant told her she did not deserve her refund. The first statement is reflected in the following log entry, dated May 2, 2000, as maintained by the IRS:

> spoke with Andrea Harchar explained the basis for taking her [tax] refund— she informed me that she had three children and was in poverty. She then began to cry and hung up the phone.....

(Doc. No. 180, Ex. Pt. 4). This entry was logged by "rabutt31," which is the code used by Robert Butts, an IRS advisor. The second statement arises from a deposition taken of Mrs. Harchar whereat she gave this testimony:

> That was after I had been run around so much, and I finally do not remember how I got a hold of that—that man. But that was sometime later after a lot of phone calls that I ended up with him. And I said, I don't understand why—I said I've been run from here to there, to there back and forth and all over the place, and I don't know why somebody can't just tell me what-am I getting my check or not, and that's when he said ... Butts ... No, I don't remember who sent me where, but I remember Mr. Butts telling me I don't deserve my money, I'll never forget that. (Deposition of Mrs. Harchar, pgs. 50–51).

I'm quoting him, you don't deserve your money. *Id.* at 53.

I was hurt, I was devastated. You don't know me to say I don't deserve my money. *Id.* at 54.

(Doc. No. 194, Pt. 1, Deposition of Mrs. Harchar, at pgs. 50–54). Concerning this testimony, the Defendant set forth that the "Court may assume for purposes of this motion an IRS employee did say that Mrs. Harchar 'did not deserve' the refund." (Doc. No. 180, at pg. 16).

Looking at the first statement, it is apparent from its context that the log entries maintained by the IRS were intended to be short and concise, and not a verbatim rendition of the parties' conversation. As such, to equate the use of the word "taking" with an act to exercise control of estate property belies its context. The word "taking" in the log entry was simply a notation used by Mr. Butts to provide a summary of what occurred during his telephone conversion with Mrs. Harchar. It had no independent legal significance, with it being highly plausible that Mr. Butts used (or could have used) a different word or words which, although conveying the same idea, would not have given rise to unnecessary legal connotations.

The second statement, that Mrs. Harchar was told that she did not "deserve" her refund, follows this same course. The Debtors are seeking to attach legal significance to a word that was said by one of its employees during the midst of a conversation. Under such conditions, it is difficult to construe the statement as anything more than a blurt of the tongue; not as the Debtors would have this Court believe, an exercise on the part of the IRS to exercise control over estate property. While Mr. Butt's statement that Mrs. Harchar did not deserve her refund was anything but polite, impoliteness does not equate with a stay violation.

The final substantive allegation put forth by the Debtors, regarding the Defendant's

failure to inform either of the Debtors or the Court that it had frozen the refund, does nothing to alter the overall course that the Debtors' Complaint for a violation of the stay under § 362(a)(3) has already taken. To begin with, the allegation that the IRS was under an affirmative duty to provide the Debtors and/or the Court with notice of its internal procedures, specifically the V–Freeze, conforms more closely to the Debtors' cause of action regarding a denial of due process, an issue which is not presently before the Court. Notwithstanding, even going to the merits of the Debtors' position, their arguments fail on both legal and factual grounds.

Legally, the Court has not been pointed to any specific statutory authority which would place the IRS under an absolute duty to notify a taxpayer that their account has been placed under administrative review. For example, as set forth earlier, unless a claim for a refund has already been denied, a suit for a refund may not be brought until the expiration of six months after the claim for the refund has been filed. 26 U.S.C. § 6532(a)(1). Under this condition, the Court cannot find, as was the similar situation earlier, that in enacting § 362(a)(3) Congress could have meant to afford a debtor the right, but not other similarly situated taxpayers, to have notice that the IRS was administratively reviewing their tax return.

From a factual standpoint, the evidence shows that in prior years the Debtors had incurred difficulties in having their tax refunds expeditiously issued, and had contacted the IRS as a result. It, therefore, strains credulity to see how the Debtors could have been completely ignorant of the possibility that their 1999 tax refund would be subject to the V–Freeze or an administrative review. Query: would any reasonable person, having failed to properly pay past tax obligations, actually believe that the automatic stay would enjoin the IRS from even reviewing their tax return to determine its correctness?

██ It is recognized that the Debtors were inconvenienced by not having their 1999 tax refund more expeditiously issued. But inconvenience does not, as the Debtors would seem to suggest, equate with "control" for purposes of § 362(a)(3), or for that matter with a stay violation in general. The Court is unaware of any authority which would provide the Debtors, or any other taxpayers, the right to have their refund quickly issued. To the contrary, the IRS is under a duty to ensure that tax returns comply with the tax code, and thus the IRS may undertake to review a person's tax return to ensure its compliance with the law, including ensuring that a taxpayer has a legitimate claim for a refund. See, e.g., 26 C.F.R. § 601.103(b) (Examination and determination of tax liability); 26 C.F.R. § 601.105 (Examination of returns and claims for refund, credit or abatement; determination of correct tax liability).

In this light, it does not seem plausible that Congress, through § 362(a)(3), could have intended the automatic stay to protect Debtors from having their tax returns reviewed by the IRS, even if the review, itself, was precipitated by the filing of the bankruptcy case. See 11 U.S.C. § 362(b)(9) (excluding certain actions by the IRS from the automatic stay, including an audit and assessment of a debtor's tax liability). As mentioned earlier, the IRS has many legitimate reasons for paying special attention to a debtor's tax return. For example, it may need to examine whether there exists the potential to setoff a tax refund against a preexisting tax debt, thereby preventing, in the words of the Defendant, the tax overpayment from going "out the door." To hold otherwise also creates a situation fraught with the poten-

tial for fraud as it would allow debtors to claim refunds while at the same time constraining the ability of the IRS to review the propriety of such refunds.

■ In sum, it is this Court's conclusion that the actions of the IRS, in refunding the Debtors' 1999 tax overpayment, cannot be said to have arisen on account of any purposeful and/or affirmative act, but instead arose from the need to properly process the Debtors' 1999 tax return. Although some of the conduct of the IRS in performing this task cannot be termed laudable, it can hardly be said to constitute an act to exercise "control" over the property. The term "control," while broad in concept under § 362(a)(3), necessarily requires some showing that the creditor sought to place the estate property beyond the reach of the creditor. *See In re Bernstein*, 252 B.R. 846, 848 (Bankr.D.D.C. 2000) (passive act does not constitute control). Under any measure, however, the actions of the IRS do not reach this level, with the IRS simply treating the Debtors on par with other similarly situated taxpayers.

### 11 U.S.C. § 362(a)(6)

■ Besides asserting that the Defendant's actions with regards to the Debtors' 1999 tax refund violated § 362(a)(3), the Debtors also assert that the same actions violate § 362(a)(6). This provision stays "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case. . . ." This provision effectuates a primary goal of the stay—that of providing a debtor a breathing spell from his or her creditors. *Brown v. Pennsylvania State Employees Credit Union (In re Brown)*, 49 B.R. 558, 561 (Bankr.M.D.Pa.1985).

In her decision, Judge Gaughan, in denying the Defendant's Motion to Dismiss on the Debtors' Complaint under § 362(a)(3), explained:

> This Section has generally been read broadly to enforce Congress's purpose of preventing harassment of debtors. In passing Section 362(a)(6), the Senate and House explained that the provision prevents creditors from attempting in any way to collect a prepetition debt. However, taken to its logical extreme, this section could be read as prohibiting all contacts between creditors and debtors. Thus, the Sixth Circuit has held that a course of conduct violates § 362(a)(6) if it (1) could reasonably be expected to have a significant impact on the debtor's determination as to whether to repay, and (2) is contrary to what a reasonable person would consider to be fair under the circumstances. Courts have declined to read Section 362(a)(6) as limited to those situations where creditors take positive steps to recover on their claims. Here, Debtors' allegations include express statements that the IRS was attempting to collect the debt as well as long delays and refusals to provide information regarding the overpayments. Accordingly, the Court agrees with the Bankruptcy Court that Debtors' allegations state a claim under the broad standards for a Section 362(a)(6) claim noted above.

*U.S. v. Harchar*, 371 B.R. at 269, *citing Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 423 (6th Cir.2000) (other internal citations and quotations omitted).

■ Section 362(a)(6) is very similar to and complements § 362(a)(3), with the major distinction between the two provisions being that § 362(a)(3) protects property of the estate, while § 362(a)(6) protects the debtor, individually. Given their similarities, conduct giving rise to a stay violation under § 362(a)(3) carries with it the potential to give rise to a stay violation under

§ 362(a)(6), and vice versa. *See Delpit v. Comm'r,* 18 F.3d 768, 772 (9th Cir.1994) (redundancy between the two *provisions); In re Microfab, Inc.,* 105 B.R. 152, 159 (Bankr.D.Mass.1989) (the provisions overlap). The opposite is also true; conduct which does not give rise to a stay violation under § 362(a)(3), will, in many instances, not be sufficient to sustain a cause for a stay violation under § 362(a)(6). *Id.* Based on this, much of this Court's discussion with regards to the applicability of § 362(a)(3) applies equally to the Debtors' cause of action under § 362(a)(6), and will not be repeated here in exacting detail, except to repeat: it mitigates strongly against finding that, as it regards the Debtors' 1999 tax refund, the IRS took any purposeful and/or affirmative act to recover on a prepetition debt, and rather shows that the IRS was going about the process to ensure that it was in compliance with bankruptcy law and that the Debtors were entitled to their refund. As a result, the following discussion will concentrate on that aspect of § 362(a)(6) which is unique from § 362(a)(3): its focus on protecting the debtor from collection activities.

■ As set forth in her decision, Judge Gaughan held that not all acts a creditor takes with respect to a debtor are stayed by § 362(a)(6). Instead, when assessing acts against a debtor for purposes of § 362(a)(6), Judge Gaughan held that the Sixth Circuit's decision in *Pertuso v. Ford Motor Credit Co.* sets forth the appropriate standard, providing that a "course of conduct violates § 362(a)(6) if it (1) could reasonably be expected to have a significant impact on the debtor's determination as to whether to repay, and (2) is contrary to what a reasonable person would consider to be fair under the circumstances." 233 F.3d at 423, *citing In re Briggs,* 143 B.R. 438, 453 (Bankr.E.D.Mich.1992). Based upon this holding in *Pertuso,* there

may be said to exist both a subjective and objective component when weighing whether a creditor's actions against a debtor constitute an "act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case...."

For this, the Court will not question that the Debtors, particularly Mrs. Harchar, subjectively believed that the actions of the IRS were instituted for the purpose of coercing her into paying her prepetition tax debt. Her deposition testimony clearly shows that she was distraught over the actions of the IRS and that this conduct could have improperly affected her judgment as it concerned her rights with the IRS under bankruptcy law. The objective component of the test in *Pertuso,* however, does not go this far.

As explained, the delay incurred in issuing the Debtors' 1999 refund stemmed from the IRS seeking to accomplish two goals: (1) to ensure that it complied with bankruptcy law by not violating the automatic stay; and (2) to assess it rights under bankruptcy law, such as determining whether it had a right to setoff or whether, as occurred in this case, it could seek to modify the Debtors' plan of reorganization. Restrained actions in the furtherance of these goals, such as the implementation of a V–Freeze, while possibly causing an inconvenience to a debtor, can hardly be said to constitute an action which would be contrary to what a reasonable person would consider to be fair under the circumstances.

Notwithstanding, this does not mean that a creditor, in pursuit of legitimate goals, can operate in a *carte blanche* manner. The key, as stated, is whether the creditor acted with reasonable restraint. Yet, contrary to the Debtors' position, the weight of the evidence, just as with § 362(a)(3), tends to show that the IRS

acted with the necessary degree of restraint.

For example, a delay measured in weeks, as opposed to months, in bringing the matter of the Debtors' 1999 tax refund before the Court for resolution can hardly be said to be unreasonable, considering the administrative burden placed on the IRS and considering that the IRS was under no legal duty to immediately issue the Debtors' refund. As an additional point, it cannot be ignored that, once the matter of their tax refund was brought before the Court, the IRS still paid the Debtors interest on their refund, thereby making the Debtors whole for any harm they may have suffered.

Also particularly telling, contrary to the normal paradigm for a stay violation, where the creditor contacts the debtor, those statements for which the Debtors complain—that the IRS was "taking" their refund and that Mrs. Harchar did not "deserve" her refund—arose as the result of Mrs. Harchar contacting the IRS, not the other way around. This strongly shows that the IRS was not seeking to place affirmative pressure on the Debtors to coerce them into paying their prepetition tax obligation. *See Brown v. Pennsylvania State Employees Credit Union,* 851 F.2d 81 (3rd Cir.1988) (communication of institutional policy which is not designed to coerce repayment does not constitute a violation of § 362(a)(6)) Again, this is not to say that the IRS proceeded in a manner beyond reproach. Yet, as with § 362(a)(3), the Court is unwilling to turn what may be termed poor conduct on the part of the IRS into a stay violation.

### CONCLUSION

In the end, it is the Debtors' burden to establish the existence of a stay violation. *In re Sullivan,* 357 B.R. 847, 854 (Bankr.D.Colo.2006) ("The moving par-

ty bears the burden of proof in an action for violation of the automatic stay and must prove the violation by a preponderance of the evidence."). For all those reasons stated, however, the Court is not convinced that, with respect to either § 362(a)(3) or § 362(a)(6), this burden has been met. Instead, when all is boiled down, the picture presented to the Court is that of two debtors who were in financial distress and who needed the funds from their tax refund as soon as possible, but who were unwilling to accept that their bankruptcy filing could entail certain consequences, namely that the IRS would manually process their refund and that the IRS could seek to assert its rights with respect to the refund through the bankruptcy process.

Thus, while the Court sympathizes with their predicament, the automatic stay does not provide the Debtors a remedy. As was noted in *In re Sullivan* "the automatic stay does not shield the debtor from all the vicissitudes, aggravations and anxiety of everyday life." *Id., citing In re Peterson,* 297 B.R. 467, 470 (Bankr.N.C. 2003).

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Accordingly, it is

***ORDERED*** that the Motion of the Plaintiffs/Debtors, Kenneth and Andrea Harchar, for Summary Judgment, be, and is hereby, DENIED; and that the Motion for Summary Judgment of the Defendant, United States of America, be, and is hereby, GRANTED.

***IT IS FURTHER ORDERED*** that, pursuant to FED.R.BANK.P 7056, the Plaintiffs' Complaint for a stay violation

with respect to their 1999 tax refund is DISMISSED.

***IT IS FURTHER ORDERED*** that at a later time convenient for both the Court and the Parties, this matter will be set for a further telephonic Pretrial so as to discuss the matter of the Debtors' 2000 year tax refund.